## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## FLORENCE DIVISION

**CYNTHIA FUERTE** and **TERRY DIMERY**, individually, and on behalf of other similarly-situated individuals,

          Plaintiffs,

v.

**CONVERGYS CORPORATION,** and **CONVERGYS CUSTOMER MANAGEMENT GROUP, INC.**, jointly and severally, as

          Defendants.

---

Honorable:

Case Number:

**COLLECTIVE AND CLASS ACTION COMPLAINT WITH JURY DEMAND**

---

## COLLECTIVE AND CLASS ACTION COMPLAINT WITH JURY DEMAND

Plaintiffs, Cynthia Fuerte and Terry Dimery, individually and on behalf of all others similarly situated, by and through their attorneys, hereby bring this Collective and Class Action Complaint against Defendants, Convergys Corporation ("Convergys") and Convergys Customer Management Group, Inc. ("CCMG") (hereinafter referred to collectively as "Defendants"), and state as follows:

### INTRODUCTION

1.    This is a collective and class action brought pursuant to 29 U.S.C. § 216(b) and Fed. R. Civ. P. 23 by Plaintiffs, Cynthia Fuerte and Terry Dimery (hereinafter referred to as "Plaintiffs"), individually and on behalf of all similarly situated persons employed by Defendants, arising from Defendants' willful violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et seq., and breach of contract under the common law.

2.     Defendants employed Plaintiffs as hourly at-home customer service representatives (CSRs).

3.     The U.S. Department of Labor recognizes that call center jobs, like those held by Defendants' CSRs, are homogenous and it issued Fact Sheet #64 in July 2008 to alert call center employees to some of the abuses, which are prevalent in the industry.

4.     One of those abuses, which is at issue in this case, is the employer's refusal to pay for work "from the beginning of the first principal activity of the workday to the end of the last principal activity of the workday." *Id.*

5.     More specifically, Fact Sheet #64 condemns an employer's non-payment of an employee's necessary pre-shift activities: "An example of the first principal activity of the day for agents/specialists/representatives working in call centers includes starting the computer to download work instructions, computer applications and work-related emails."  Additionally, the FLSA requires that "[a] daily or weekly record of all hours worked, including time spent in pre-shift and post-shift job-related activities must be kept." *Id.*

6.     Defendants failed to pay Plaintiffs and all similarly situated employees for their pre-shift time spent booting up their computers, logging into required computer networks and software applications, and reviewing work-related e-mails and other information at the start of their shift.

7.     Defendants also failed to compensate Plaintiffs and other CSRs for all of the mid-shift technical down time incurred due to problems with their computers, networks, software applications, and phones.

8.     Finally, Defendants failed to pay Plaintiffs and all similarly situated employees for their post-shift time spent shutting down, logging out of required computer networks and software applications, and reviewing work-related e-mails and other information at the end of their shift.

## JURISDICTION AND VENUE

9.     This Court has subject-matter jurisdiction over Plaintiffs' FLSA claim pursuant to 28 U.S.C. § 1331 because Plaintiffs' claim raises a federal question under 29 U.S.C. § 201, *et seq.*

10.     Additionally, this Court has jurisdiction over Plaintiffs' collective action FLSA claim pursuant to 29 U.S.C. § 216(b), which provides that suit under the FLSA "may be maintained against any employer … in any Federal or State court of competent jurisdiction."

11.     Defendants' annual sales exceed $500,000 and they have more than two employees, so the FLSA applies in this case on an enterprise basis.  Defendants' CSRs engage in interstate commerce and therefore they are also covered by the FLSA on an individual basis.

12.     A private party may also bring an action for damages for breach of contract under the common law.  Plaintiffs' breach of contract claims originate from the same facts that form the basis of their federal claims.  The court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367.

13.     This Court has jurisdiction over Plaintiffs' state law claims pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d).  The aggregate claims of the individual Class members exceed the sum value of $5,000,000 exclusive of interest and costs, there are believed to be in excess of 100 Class members, and this is a case in which more than two-thirds of the proposed Class members are citizens of different states.

14.     This Court has personal jurisdiction over Defendants because they do business within the state of South Carolina. Upon information and belief, Defendants are corporate entities

incorporated in the state of Ohio, but registered in the State of South Carolina with a registered agent and office address of C T Corporation System, 2 Office Park Court, Ste. 103, Columbia, South Carolina 29223.

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) because Defendants employ CSRs in this district, conducts business in this district, and a substantial portion of the events that give rise to the Plaintiffs' claims occurred in this district.

## PARTIES

16.     Plaintiff, Cynthia Fuerte, is a resident of Myrtle Beach, South Carolina.  Defendants employed her as an hourly CSR from approximately February 2015 to October 2015.   At all relevant times, she worked from her residence in Myrtle Beach, South Carolina.  Ms. Fuerte signed a consent form to join this lawsuit, which is attached to this Complaint as ***Exhibit A***.

17.     Plaintiff, Terry Dimery, is a resident of Boynton Beach, Florida, and was employed by Defendants as an hourly CSR from approximately November 2015 to January 2017.  At all relevant times, he worked from his residence in Boynton Beach, Florida.  Mr. Dimery has signed a consent form to join this lawsuit, which is attached to this Complaint as ***Exhibit B***.

18.     Defendant Convergys is an Ohio Corporation registered in Ohio with Entity ID #947163 and a registered agent and office address of C T Corporation System, 1300 East 9th Street, Cleveland, OH 44114.  At all relevant times, Convergys was doing business in South Carolina.

19.     Defendant CCMG is an Ohio Corporation registered in Ohio with Entity ID #734414 and a registered agent and office address of C T Corporation System, 1300 East 9th Street, Cleveland, OH 44114.  At all relevant times, CCMG was doing business in South Carolina.

20.     Defendants operate a joint website, which claims that they are "the world leader in customer experience outsourcing."  See http://www.convergys.com/ (last visited on 2/15/17).

21.     Defendants claim to employ 130,000 people around the world at over 150 locations. See, http://www.convergys.com/ (last visited on 2/15/17).

## GENERAL ALLEGATIONS

22.     While employed by Defendants, Plaintiff, Cynthia Fuerte, was paid at a rate of $8.75 per hour, plus commission and bonus.

23.     While employed by Defendants, Plaintiff, Terry Dimery, was paid at a rate of $9.00 per hour.

24.     Defendants mission statement states that they are "a people-focused business of 130,000 dedicated professionals, speaking 58 languages and working from more than 150 locations in 33 countries."   See http://www.convergys.com/about/mission-values (last visited 3/7/17).

25.     Defendants' website solicits business from clients and states "[l]et Convergys help you deliver a personalized, multichannel customer experience that meets your customer care and business goals while lowering your service costs."  "We combine decades of experience with our integrated, end-to-end solution of advanced analytics, omnichannel technology, and global outsourcing to design, unify, and optimize the customer care expereinece."   See http://www.convergys.com/client-solutions/capabilities/customer-care (last visited on 3/7/17).

26.     Among the 130,000 employees of Defendant are the CSRs.  Defendant's website states that "Convergys' home agent program combines the many advantages of home agent staffing with proven security, technology, compliance, and operational expertise for recruiting, training, coaching, and managing home agents."   See http://www.convergys.com/client-solutions/capabilities/home-agent (last visited on 3/7/17).

27.    The "Convergys Anywhere program hires sales & service agents who work from home." "For example, when you call the customer service department for your cell phone or cable provider, you just might be talking to a Convergys home based customer service & sales agent – answer that call on behalf of one of our clients. These calls might involve billing questions, changes or cancellations of services, inquiries on the status of an order, troubleshooting services etc." See http://www.convergys.com/career-details.php?id=R1028342 (last visited on 3/7/17).

28.    Regardless of the geographic location in which the CSR works, all of Defendants' CSRs use multiple computer networks software applications in the course of performing their job responsibilities. These programs and applications are integral and an important part of the CSR's work and they cannot perform their jobs without them.

29.    Some of the equipment that all CSRs are required to have includes: a router that supplies two or more IP addresses and is connected to a PC; a USB or Analog Headset; a minimum of a 17" monitor with minimum resolution of 1280 x1024 (Televisions used as monitors, touch screen monitors and dual monitors are not acceptable); and a Convergys Approved Flashdrive.

30.    In order to perform their job, Plaintiffs, and those similarly situated, were required to boot up and log in to various computer networks, software programs and applications, including those referenced above, in order to access information necessary to perform their job functions. The pre-shift boot-up/log-in process took substantial time on a daily basis ranging from twelve (12) and eighteen (18) minutes per day, and even longer on days where Defendants' computer networks and programs were not working properly.

31.    Defendants provided Plaintiff, Terry Dimery, with training materials that included a "Daily Start of Day Checklist." CSRs were told to "[p]lease use the following steps when starting your computer systems each day." *Exhibit C*, Daily Start of Day Checklist.

32.     The Daily Start of Day Checklist laid out thirteen-steps in chronological order: 1) Make sure your computer is completely off; 2) Reboot your Modem and Router; 3) With your PC still in OFF mode, insert your USB drive into an available USB port; 4) Turn on your PC and begin tapping the required function key to access the Boot Menu for your PC; 5) Once you have access to the boot menu, select the designated USB option; 6) Start the Linux Desktop (Convergys Home Agent Desktop Environment), then you should see Connection Established in the bottom right; 7) Log into Lady with Lamp page, up to 5 minutes early, with your LAN ID and LAN Passowrd; 8) Next a new tab will populate for the Citrix XenApp login … login using your LAN ID and LAN Password; 9) At this point your e-start punch time will take place automatically; 10) Click Agent at Home folder displayed on your Citrix applications screen; 11) Click XA65 – eBay Training; 12) At this point you will see "connecting …", once that is complete, click OK; 13) At the start of your scheduled shift, you will need to change your activity code in e-start to 37-002. (Do not be late). ***Exhibit C***, Daily Start of Day Checklist.

33.     The process as described in the *Daily Start of Day Checklist*, requires CSRs to complete at least eight (8) of the thirteen (13) start-up steps before they are clocked in.

34.     The pre-shift off-the-clock time Plaintiffs and all other CSRs spend booting-up/logging-in to their computers directly benefited Defendants.

35.     The pre-shift boot-up/log-in process was an integral and indispensable part of Plaintiffs' job responsibilities as CSRs.

36.     Additionally, at the end of the day, Plaintiffs and all other CSRs were required to log-out of the time keeping system before closing out and shutting down their computers, software applications, and networks which resulted in additional off-the-clock work.

37.     The post-shift work performed after disconnecting from Defendants' network and logging out of the timekeeping system took between three (3) and four (5) minutes at the end of each shift.

38.     The post-shift off-the clock time Plaintiffs and all other CSRs spend logging-out/shutting-down directly benefited Defendants.

39.     The post-shift log-out/shut-down process was an integral and indispensable part of Plaintiffs' job responsibilities as CSRs.

40.     At all relevant times, Defendants controlled Plaintiffs' and all other CSRs' work schedule, duties, protocols, applications, assignments and employment conditions.

41.     Defendants maintained and enforced a common attendance policy for all CSRs that was based on a point system, whereby, the CSR was assessed points for each absence, tardy, and early departure.  In the event that a CSR accumulated 12 points, the consequence was "probable termination of employment."  Conversely, if the CSR worked 60 calendar days without an occurrence, they were credited with one (1) full attendance point.

42.     Despite knowing Plaintiffs and other CSRs performed work before and after their scheduled shifts, Defendants and their managers failed to make any effort to stop or disallow this pre-, mid-, and post-shift work and instead suffered and permitted it to happen.

43.     Defendants possess, control, and/or have access to information and electronic data indicating the times Plaintiffs and other CSRs booted up and logged into their computers and logged-out and shut-down each day and the time they logged into their telephone systems.

44.     Defendants also possess, control, and/or have access to information and electronic data indicating the times Plaintiffs and other CSRs experienced technical down time.

45.     Despite their ability to track the amount of time Plaintiffs and other CSRs spent in connection with the pre-shift boot-up/log-in process and post-shift shut-down/log-out, and technical downtime, Defendants failed to pay Plaintiffs and other CSRs for the off-the-clock work they performed each shift.

**A.  Pre-Shift Off-the-Clock Work**

46.     Pursuant to Defendants' policies, training, and direction, Plaintiffs and all other CSRs were required to start-up and log-in to various secure computer networks and software applications in order to access information. They were also required to log-into their phones.  The pre-shift start-up and log-in process takes substantial time on a daily basis with said time ranging from twelve (12) to eighteen (18) per day, or even longer when technical issues arise.  Before clocking in, and at the direction of Defendants. Plaintiffs and all other CSRs are required to undertake the following essential work tasks in chronological order:

- Made sure the computer was completely off.

- Reboot the Modem and Router.  This involved completely unplugging the modem and router from the wall, then waiting approximately one minute, then plug modem and router back, wait for a signal on the modem, push the refresh button on the router.  ***This generally took between four (4) to five (5) minutes***.

- The CSR was then required to insert a USB drive into an available USB port, while the computer was still turned-off.

- Next, the CSR powered on their computer and began tapping the required function key (F12) to access the boot menu.  ***This process generally took about two (2) to three (3) minutes***.

- After the CSR gained access to the boot menu, they selected the designated USB option. There were two options: remain connected to the home/personal computer desktop or connect to the Convergys Home Agent Desktop.

- The CSR chose the Linux Desktop (Convergys Home Agent Desktop) and waited to establish a connection. ***This step of the process took between three (3) to five (5) minutes***.

However, if the Convergys Network had a poor connection or was otherwise running slow it could take fifteen (15) minutes or more to establish the connection.

- Once connected to the Convergys Home Agent Desktop, the CSR opened several applications, including: Mozilla Fire Fox, HA – Home Depot, and CVG Web Interface (Convergys portal page). ***This took the CSRs between two (2) to three (3) minutes***.

- Next, the CSRs logged into Citrix XenApp using another username and password. ***This took between one (1) to two (2) minutes***.

- Finally, once fully logged into Citrex XenApp the CSR was automatically punched in via "e-start punch time."

47.     Defendants' CSRs completed the pre-shift process outlined above each shift; however, they were not actually "clocked in" for their shifts until *after* they started-up their computers, connected to the virtual private network, and opened several essential software applications (many of which required usernames and passwords).

48.     As a result, Plaintiffs and other CSRs spent between twelve (12) and eighteen (18) minutes at the beginning of each shift performing off-the-clock work for Defendants.

49.     The unpaid off-the-clock work performed prior to each shift by Plaintiffs and other CSRs directly benefitted Defendants, and the tasks undertaken in connection with the off-the-clock work were integral and indispensable to their job duties and responsibilities as CSRs.

**B.  Post-Shift Off-the-Clock Work**

50.     Pursuant to Defendants' policies, training and direction, Plaintiffs and all other CSRs were required to completely shut-down their computers and log-out of all software applications used during their shift.  This process was done after they logged-out of Defendants' timekeeping system.  The post-shift log-out and shutdown process took substantial time on a daily basis with said time ranging from three (3) to four (4) minutes per day.

51.     At the end of the day, after the CSRs removed themselves from the Avaya "available" status, closed multiple software applications, disconnected from Citrix, and performed a complete shut-down. After clocking out of Defendants' timekeeping system (Citrix), the Plaintiffs and other CSRs must complete the following essential work activities off-the-clock in chronological order:

- First, CSRs were required to log-out and close down Citrix. In order to log-out/close Citrix, after clicking through multiple windows, the CSR was required to wait for the application to disconnect. **This step generally took about one (1) minute**.

- Next, the CSR was required to close windows that remained open, such as Mozilla Fire Fox.

- After the CSR had fully logged-out/closed Citrix and any other windows that remained open, they were required to disconnect and log-off of the Convergys Home Desktop. **This process took between one (1) to two (2) minutes, or even longer if there were connection issues**.

- The CSR was then required to do a complete shut-down of their computer. **This took approximately one (1) additional minute**.

52.     Pursuant to the above process, Defendants failed to pay Plaintiffs and other CSRs for three (3) to four (4) minutes of off-the-clock work performed each shift.

53.     The unpaid post-shift off-the-clock work performed by Plaintiffs and other CSRs at the end of each shift directly benefits Defendants and the tasks undertaken in connection with the post-shift off-the-clock work are integral and indispensable to their job duties and responsibilities as CSRs.

**C.  Technical Malfunction (Down-Time) Spent Off-the-Clock**

54.     In addition to the off-the-clock time spent during the start-up/log-in and shut-down/log-out procedures outlined herein, Plaintiffs and other CSRs frequently spent significant time waiting and assisting Defendants' technical support team in troubleshooting problems they encountered with the network and the various software applications.

55.     Before contacting the technical support team with a technical problem, Defendants trained and instructed Plaintiffs and other CSRs to perform a "Power Down" to correct the problem. A "Power Down" required the CSR to push and hold the power button on their computer for three seconds. This completely powered down the computer, removed the CSR from the timekeeping system, and required them to perform the entire log in process set forth in paragraph 45 of this Complaint. Defendants did not pay Plaintiffs and other CSRs for this time.

56.     When Plaintiffs and other CSRs encountered technical difficulties with their networks, programs, phones, applications, and other programs that they could not resolve with a "Power Down," they were required to change their status from "Available," clock-out of Defendants' timekeeping system, contact the technical support team, and wait/assist the technical support team while they attempted to resolve the problem. This often required them to wait on hold for appreciable amounts of time.

57.     Although Plaintiffs and other CSRs were compensated for some tech down time, they were not paid for all time spent working with Defendants' technical team.

58.     Additionally, Plaintiffs and other CSRs often lost their connection to Defendant's VPN or to other applications when they went on break and their systems became idle. As a result, Plaintiffs and other CSRs were required to undertake the log in process laid out in paragraph 45 of this Complaint.

59.     The mid-shift time spent off the clock directly benefitted Defendants', and was compensable time, and is an element of damages in this lawsuit.

60.     Upon information and belief, Defendants have records in their possession that will illustrate the time spent by Plaintiffs and other CSRs working with the technical support team to correct problems with their computers, phones, and programs/applications.

**D. Exemplary Pay-Period to Illustrate Pre- and Post-Shift Compensation Deficiencies**

61.     An example of a specific workweek where Defendants failed to pay Plaintiff Terry Dimery all overtime for hours worked in excess of 40 hours (as mandated by the FLSA) includes the following:

**Pay Period of 12/06/2015 to 12/19/2015**

- Plaintiff's paystub states that he worked 86.51 hours and was paid at a regular hourly rate of $9.00 per hour for each hour of each workweek.

- Plaintiff's overtime rate was $13.50 per hour. Plaintiff received 6.46 hours of overtime, but no overtime pay for the time spent undertaking the pre-, mid-, and post-shift activities described herein.

- With pre-shift time of 12-18 minutes per shift and post-shift time of 3-4 minutes per shift, Plaintiff should have been paid for an additional 75 to 110 minutes for each workweek at his overtime rate of $13.50 per hour (assuming that he worked five shifts in a week) and an additional amount for tech time if he experienced connectivity issues during this pay period.

*Exhibit D*, Dimery Paystubs.

**Pay Period of 10/23/206 to 11/05/2016**

- Plaintiff worked 93.55 hours and was paid at a regular hourly rate of $9.00 per hour for each hour of each workweek.

- Plaintiff's overtime rate was $13.50 per hour. Plaintiff received 5.04 hours of overtime, but no overtime pay for the time spent undertaking the pre-, mid-, and post-shift activities described herein.

- With pre-shift time of 12-18 minutes per shift and post-shift time of 3-4 minutes per shift, Plaintiff should have been paid for an additional 75 to 110 minutes for each workweek at his overtime rate of $13.50 per hour (assuming that he worked five shifts in a week) and an additional amount for tech time if he experienced connectivity issues during this pay period.

*Exhibit D*, Dimery Paystubs.

62.     The paystubs illustrate that Defendant failed to pay Plaintiff at the FLSA mandated overtime premium.

### E. **Defendants Benefitted from the Uncompensated Off-the-Clock Work**

63.     At all relevant times, Defendants directed and directly benefited from the work performed by Plaintiffs and similarly situated employees in connection with the above described pre-, mid- and post-shift activities performed by Plaintiffs and other CSRs.

64.     At all relevant times, Defendants controlled the work schedules, duties, protocols, applications, assignments and employment conditions of Plaintiffs and other CSRs.

65.     At all relevant times, Defendants were able to track the amount of time Plaintiffs and the other CSRs spent in connection with the pre-, mid- and post-shift activities however, Defendants failed to do so and failed to compensate Plaintiffs and other CSRs for the off-the-clock work they performed.

66.     At all relevant times, Plaintiffs and the CSRs were non-exempt hourly employees, subject to the requirements of the FLSA.

67.     At all relevant times, Defendants used its attendance and adherence policies against Plaintiffs and the CSRs in order to pressure them into performing the pre-, mid- and post-shift off-the-clock work.

68.     Defendants expressly trained and instructed Plaintiffs and its other CSRs to perform the above-described pre-shift activities before clocking into Defendants' timekeeping system and their shift's scheduled start time to ensure they were prepared to take calls at the moment their shift began.

69.     At all relevant times, Defendants' policies and practices deprived Plaintiffs and the CSRs of wages owed for the pre-shift, mid-shift and post-shift activities they performed. Because Defendants' CSRs typically worked forty (40) hours or more in a workweek, Defendants' policies and practices also deprived them of overtime pay.

70.     Defendants knew or should have known that the time spent by Plaintiffs and its other CSRs in connection with the pre-, mid- and post-shift activities is compensable under the law. Indeed, in light of the explicit DOL guidance cited above, there is no conceivable way for Defendants to establish that they acted in good faith.

71.     Unpaid wages related to the off-the-clock work described herein is owed to Plaintiffs at the FLSA mandated overtime premium of one-and-one-half the Plaintiffs' regular hourly rate because Plaintiffs regularly worked in excess of forty (40) hours in a workweek.

## COLLECTIVE ACTION ALLEGATIONS

72.     Plaintiffs bring this action pursuant to 29 U.S.C. § 216(b) of the FLSA on behalf of themselves and on behalf of:

> *All current and former hourly at-home customer service representatives who worked for Convergys at any time from March ___, 2014 through the date of judgment*

(hereinafter referred to as the "Class" or "FLSA Collective").  Plaintiffs reserve the right to amend this definition if necessary.

73.     Defendants are liable under the FLSA for, *inter alia*, their failure to properly compensate Plaintiffs and other similarly situated CSRs.

74.     Excluded from the proposed FLSA Collective are Defendants' executives, administrative and professional employees, including computer professionals and outside sales persons.

75.     Consistent with Defendants' policy and pattern or practice, Plaintiffs and the members of the FLSA Collective were not paid for all premium overtime compensation when they worked beyond 40 hours in a workweek.

76.     All of the work that Plaintiffs and the members of the FLSA Collective have performed has been assigned by Defendants, and/or Defendants have been aware of all of the work that the Plaintiffs and the FLSA Collective have performed.

77.     As part of its regular business practice, Defendants intentionally, willfully, and repeatedly engaged in a pattern, practice, and/or policy of violating the FLSA with respect to Plaintiffs and the members of the FLSA Collective.  This policy and pattern or practice includes, but is not limited to:

    a.    Willful failure to pay its employees, including Plaintiffs and the members of the FLSA Collective, for all premium overtime wages for hours that they worked off-the-clock in excess of forty (40) hours per workweek;

    b.    Willful failure to pay its employees, including Plaintiffs and the members of the FLSA Collective, for hours worked off-the-clock;

    c.    Willful failure to record all of the time that its employees, including Plaintiffs and the members of the FLSA Collective, have worked for the benefit of Defendants.

78.     Defendants are aware or should have been aware that federal law required them to pay Plaintiffs and the members of the FLSA Collective overtime premiums for all hours worked in excess of forty (40) per workweek.

79.     Defendants' unlawful conduct has been widespread, repeated, and consistent.

80.     A collective action under the FLSA is appropriate because the employees described above are "similarly situated" to Plaintiffs under 29 U.S.C. § 216(b). The employees on behalf of whom Plaintiffs bring this collective action are similarly situated because (a) they have been or are employed in the same or similar positions; (b) they were or are performing the same or similar job duties; (c) they were or are subject to the same or similar unlawful practices, policy, or plan; and (d) their claims are based upon the same factual and legal theories.

81. The employment relationships between Defendants and every proposed FLSA Collective member are the same and differ only by name, location, and rate of pay. The key issues – the amount of uncompensated pre-shift start-up/log-in time, time spent in connection with mid-shift connectivity issues, and the amount of post-shift log-out/shut-down time owed to each employee – does not vary substantially among the proposed FLSA Collective members.

82. There are many similarly situated current and former CSRs who have been underpaid in violation of the FLSA who would benefit from the issuance of a court-supervised notice of this lawsuit and the opportunity to join it.

83. This notice should be sent to the FLSA Collective pursuant to 29 U.S.C. §216(b).

84. Those similarly situated employees are known to Defendants, are readily identifiable, and can be located through Defendants' records.

85. Plaintiffs estimate the putative Class, including both current and former employees over the relevant period, includes hundreds, if not thousands of members. The precise number of Class members should be readily available from a review of Defendants' personnel and payroll records.

## RULE 23 NATIONWIDE CLASS ACTION ALLEGATIONS

86. Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on their own behalf and on behalf of:

> *All current and former hourly at-home customer service representatives who worked for Convergys at any time from March ___, 2014 through the date of judgment.*

(hereinafter referred to as the "Rule 23 Nationwide Class"). Plaintiffs reserve the right to amend this definition if necessary.

87.     The members of the Rule 23 Nationwide Class are so numerous that joinder of all Rule 23 Nationwide Class members in this case would be impractical. Plaintiffs reasonably estimate there are thousands of Rule 23 Nationwide Class members. Rule 23 Nationwide Class members should be easy to identify from Defendants' computer systems and electronic payroll and personnel records.

88.     There is a well-defined community of interests among Rule 23 Nationwide Class members and common questions of law and fact predominate in this action over any questions affecting individual members of the Rule 23 Nationwide Class. These common legal and factual questions, include, but are not limited to, the following:

     a.   Whether the pre-shift time Rule 23 Nationwide Class members spend on start-up and log-in activities each session is compensable time;

     b.   Whether the post-shift time Rule 23 Nationwide Class members spend on shutdown and log-out activities is compensable time;

     c.   Whether mid-shift time spent by the Rule 23 Nationwide Class members in connection with logging back into their computers after breaks, out of their computers to go on breaks, and for technical connectivity issues is compensable time; and

     d.   Whether Defendants' non-payment of wages to the Rule 23 Nationwide Class members for all compensable time amounted to a breach of contract.

89.     Plaintiffs' claims are typical of those of the Rule 23 Nationwide Class in that they and all other Rule 23 Nationwide Class members suffered damages as a direct and proximate result of the Defendants' common and systemic payroll policies and practices. Plaintiffs' claims arise from the same pay policies, practices, promises and course of conduct as all other Rule 23 Nationwide Class members' claims and their legal theories are based on the same legal theories as all other Rule 23 Nationwide Class members.

90. Plaintiffs will fully and adequately protect the interests of the Rule 23 Nationwide Class and they retained counsel who are qualified and experienced in the prosecution of nationwide wage and hour class actions. Neither Plaintiffs nor their counsel have interests that are contrary to, or conflicting with, the interests of the Rule 23 Nationwide Class.

91. A class action is superior to other available methods for the fair and efficient adjudication of this controversy, because, *inter alia*, it is economically infeasible for Rule 23 Nationwide Class members to prosecute individual actions of their own given the relatively small amount of damages at stake for each individual along with the fear of reprisal by their employer.

92. This case will be manageable as a Rule 23 Class action. Plaintiffs and their counsel know of no unusual difficulties in this case and Defendants and its corporate clients all have advanced, networked computer and payroll systems that will allow the class, wage, and damages issues in this case to be resolved with relative ease.

93. Because the elements of Rule 23(b)(3) are satisfied in this case, class certification is appropriate. *Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. 393; 130 S. Ct. 1431, 1437 (2010) ("[b]y its terms [Rule 23] creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action").

94. Because Defendants acted and refused to act on grounds that apply generally to the Rule 23 Nationwide Class and declaratory relief is appropriate in this case with respect to the Rule 23 Nationwide Class as a whole, class certification pursuant to Rule 23(b)(2) is also appropriate.

### COUNT I

### (29 U.S.C. § 216(b) Collective Action)

### <u>VIOLATION OF THE FAIR LABOR STANDARDS ACT,<br>29 U.S.C. § 201, *et seq*. -- FAILURE TO PAY OVERTIME</u>

95.     Plaintiffs re-allege and incorporate all previous paragraphs herein and further allege as follows.

96.     At all times relevant to this action, Defendants were joint employers under 29 U.S.C. § 203(d) of the FLSA and subject to the mandates of the FLSA, 29 U.S.C. § 201, *et seq. See also* 29 C.F.R. § 791.2(b).

97.     At all times relevant to this action, Defendants engaged in interstate commerce, or in the production of goods for commerce, as defined by the FLSA.

98.     At all times relevant to this action, Plaintiffs were "employees" of Defendants within the meaning of 29 U.S.C. § 203(e)(1) of the FLSA.

99.     Plaintiffs and other FLSA Collective members, by virtue of their job duties and activities actually performed, are all non-exempt employees.

100.    Plaintiffs either: (1) engaged in commerce; or (2) engaged in the production of goods for commerce; or (3) were employed in an enterprise engaged in commerce or in the production of goods for commerce.

101.    At all times relevant to this action, Defendants "suffered or permitted" Plaintiffs and all similarly situated current and former employees to work and thus "employed" them within the meaning of 29 U.S.C. § 203(g) of the FLSA.

102.    At all times relevant to this action, Defendants required Plaintiff and all the FLSA Collective members to perform twelve (12) and eighteen (18) minutes of uncompensated pre-shift work and post-shift work, per shift, and Defendants failed to pay these employees the federally mandated overtime compensation for all services performed.

103.    In addition to the time spent pre- and post-shift, Plaintiffs spent considerable time working off the clock each day logging-in-and-out of their computer networks and programs before

and after breaks. Plaintiffs also spent considerable time working off the clock during times that they were experiencing technical difficulties with their computers, programs, and networks. Defendant failed to compensate Plaintiffs for all mid-shift work tasks completed.

104.     The off-the-clock work performed every shift by Plaintiffs and the FLSA Collective is an essential part of their jobs and these activities and the time associated with these activities is not *de minimis*.

105.     In workweeks where Plaintiffs and other Collective members worked 40 hours or more, the uncompensated off-the-clock work time, and all other overtime should have been paid at the federally mandated rate of 1.5 times each employee's regular hourly wage, including shift differential where applicable. 29 U.S.C. §207.

106.     Defendants' violations of the FLSA were knowing and willful. Defendants knew or could have determined how long it took for its CSRs to perform their off-the-clock work. Further, Defendants could have easily accounted for and properly compensated Plaintiffs and the FLSA Collective for these work activities, but did not.

107.     The FLSA, 29 U.S.C. § 216(b), provides that as a remedy for a violation of the Act, an employee is entitled to his or her unpaid wages (including unpaid overtime), plus an additional equal amount in liquidated damages (double damages), plus costs and reasonable attorneys' fees.

**COUNT II**

**(Rule 23 Nationwide Class Action)**

**<u>BREACH OF CONTRACT</u>**

108.     Plaintiffs re-allege and incorporates all previous paragraphs herein and further allege as follows.

109.     At all times relevant to this action, Defendant had a binding and valid contract with Plaintiffs and every other Rule 23 Nationwide Class member to pay each employee for each hour

they worked at a pre-established (contractual) regular hourly rate in consideration of the work duties Plaintiffs and the Rule 23 Nationwide Class members performed on behalf of Defendants.

110.    Upon information and belief, each Rule 23 Nationwide Class member, including Plaintiffs, has an hourly rate of approximately $8.00 to $10.00 per hour.

111.    Plaintiffs and every other Rule 23 Nationwide Class member accepted the terms of Defendants' contractual promises and performed under the contract by doing their jobs and carrying out the work they performed each shift including the unpaid off-the-clock work that was required of them in connection with pre-shift, technical down-time, and post-shift work activities, described herein.

112.    By not paying Plaintiffs and every other Rule 23 Nationwide Class member the agreed upon hourly wage for the work they performed each shift in connection with the off-the-clock work they performed, Defendants systematically breached its contracts with Plaintiffs and each member of the Rule 23 Nationwide Class.

113.    Plaintiffs' and the Rule 23 Nationwide Class members' remedies under the FLSA are inadequate in this case to the extent Defendants paid them more than the federally mandated minimum wage of $7.25 per hour, but less than forty (40) hours per week (i.e., pure "gap time" claims).

114.    Defendants also breached their duty of good faith and fair dealing by failing to keep track of the time Plaintiffs and other Rule 23 Class members spent performing off-the-clock activities, which is a fundamental part of an "employer's job."

115.    As a direct and proximate result of Defendants' contractual breaches, Plaintiffs and every other member of the Rule 23 National Class have been damaged, in an amount to be determined at trial.

116.    These claims are appropriate for class certification under Rule 23(b)(2) and (b)(3) because the law of contracts is substantially the same in South Carolina as it is in the other states from which the Plaintiffs reside.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request the following relief:

a.    An Order certifying this case as a collective action in accordance with 29 U.S.C. § 216(b) with respect to the FLSA claims set forth herein (Count I);

b.    An Order certifying this action as a class action for the Rule 23 Nationwide Class pursuant to Rule 23(b)(2) and (b)(3) with respect to Plaintiffs' breach of contract claim (Count II);

c.    An Order compelling Defendants to disclose in computer format, or in print if no computer readable format is available, the names and addresses of all collective action Class members and Rule 23 Nationwide Class members, and authorizing Plaintiffs to send notice of this action to all those similarly situated individuals, including the publishing of notice in a manner that is reasonably calculated to apprise the class members of their rights by law to join and participate in this lawsuit;

d.    An Order designating the Plaintiffs as representatives of the FLSA collective action Class and the Rule 23 Nationwide Class; and undersigned counsel as Class counsel for the same;

e.    An Order declaring Defendants violated the FLSA and the Department of Labor's attendant regulations as cited herein;

f.    An Order declaring Defendants' violations of the FLSA were willful;

g.    An Order declaring Defendants breached their contracts with Plaintiffs and the members of the Rule 23 Nationwide Class by failing to pay them for each hour they worked at a pre-established (contractual) regularly hourly rate;

h.    An Order granting judgment in favor of Plaintiffs and against Defendants and awarding Plaintiffs, the collective action Class, and the Rule 23 Nationwide Class, the full amount of damages and liquidated damages available by law;

i.    An Order awarding reasonable attorneys' fees and costs incurred by Plaintiffs in filing this action as provided by statute;

j.    An Order awarding pre- and post-judgment interest to Plaintiffs on these damages;

and

k.      An Order awarding such other and further relief as this Court deems appropriate.

## **JURY DEMAND**

Plaintiffs, Cynthia Fuerte and Terry Dimery, individually and on behalf of all others similarly situated, by and through their attorneys, hereby demand a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure and the court rules and statutes made and provided with respect to the above entitled cause.

Respectfully Submitted,


s/ Benjamin A. Baroody
Benjamin A. Baroody
SC Fed Ct. ID 9442
BELLAMY RUTENBERG COPELAND
EPPS GRAVELY & BOWERS, P.A.
1000 29th Avenue
Myrtle Beach, SC 29577
T: 843-448-2400
E: BBaroody@Bellamy.com

*Local Counsel for Plaintiffs*

Jason J. Thompson (MI Bar No. 47184)
Kevin J. Stoops (MI Bar No. P64371)
Charles R. Ash, IV (MI Bar No. P73877)
SOMMERS SCHWARTZ, P.C.
One Towne Square, Suite 1700
Southfield, Michigan 48076
T: 248-355-0300
E: jthompson@sommerspc.com
E: kstoops@sommerspc.com
E: crash@sommerspc.com

*Trial Counsel for Plaintiffs*
*Pending Pro Hac Vice*